19-2603, Ms. Hagley, and Mr. Blair. Ms. Hagley, whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. Judith Hagley from the Department of Justice, representing the Commissioner. I'd like to reserve two minutes for rebuttal, if I may. Not a problem. Thank you. The $170 million in unrestricted cash grants transferred to Broker Tec affiliates, in this case, do not qualify as non-taxable contributions to capital for two alternative reasons, both based on the tax court's findings. Number one, the grants were completely unrestricted. They could have been used for any purpose, to pay out dividends, to pay operating expenses, and they were not conditioned on or restricted to capital improvements or to a capital reserve account. The second alternative reason is that New Jersey expected to receive a definite benefit and, in fact, conditioned its payment on the grants on its receipt of the definite benefit in the form of a quid pro quo. Can I just take you to the regulation? It says that Section 118, which is the exclusion here for contributions to capital, applies to contributions to capital made by persons other than shareholders. That would be our case. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community or for the purpose of expanding its operating facilities. Why is that not our case? In other words, the first part, inducing them to come across the river to New Jersey. For two reasons, Ron. Number one, the regulation doesn't address the situation here where you have completely unrestricted cash grants. In discussing location inducement, it's talking about land or other property. And it also doesn't deal with the situation where, in addition to inducing the move, the transfer expected to receive a direct benefit, as is also the case in this situation. The regulation doesn't purport to displace the CB&2 analysis from the Supreme Court. It doesn't set out the test for contributions to capital. It just provides contrasting examples as the Sixth Circuit made clear in the Federal Aid Department's decision that Broker Tech relies on. But the text of that provision doesn't state that there must be a limitation on the use of the funds, does it? No, the text doesn't. But in discussing the location inducement example, it's talking about land and property. And it's understood there that the land and the property would be used as part of the relocation, as was the case in the K products where a plant was transferred to the taxpayer there to actually use in its business. There is not a blanket exclusion for location inducements, as this Court made clear in the John B. White case. This Court has twice rejected capital contribution treatment for location inducements. Sometimes they qualify, sometimes they don't. But the courts have to engage in the analysis, and it was rejected in the GM trading case, which was another location inducement. Part of the contribution did not qualify because, in that case, the transfer received a direct benefit in the form of debt forgiveness from the transferee, and to the extent of the direct benefit, it did not qualify. Did Brown Shoe have an unrestricted component to it? It had cash and it had some kind of real property or building. But did it have an unrestricted component? And if so, how do you square your position with Brown Shoe? So in Brown Shoe, there was about $900,000 in cash and property, mainly cash, transferred to the taxpayer there in consideration and due to the requirement that engaged in capital improvement, buildings and equipment. There was a small portion, about 1%, $10,000, that was transferred, which the Court noted, free of a contractual requirement that it be invested in capital improvement. But what the Court emphasized is that the total amount was less than the amount of cash required to engage in the contractually required capital improvement. So even with regard to that $10,000, it was understood that it would be part of a reimbursing the capital improvements that were required by contract. So I think that is how we square it. Plus, our alternative grounds in this case for reversing the tax court is a direct benefit. And in Brown Shoe, the Court held that the transfer there received no recompense whatsoever. Whereas in this case, the tax court found, relying on the tax court's findings, that before New Jersey pays a dime, it certifies that it has received additional tax revenue from the wages that the affiliates paid to their employees, that the grants were conditioned on and were a percentage of this additional tax revenue. So there's absolutely no risk to New Jersey. Before it pays $8 in grants to Garvin, one of the affiliates, it knows it will receive and will have confirmed it has in fact received $10. So is it your position that it's different than some of the other cases which talked about some kind of generalizable benefit to the community at large or the state at large is not the type of benefit contemplated under Chicago, but here is your position, this is a direct benefit because the state wants to get the benefit before it even releases any funds? That's exactly right. This case, the key under the Supreme Court's case law is that the transfer will face any risk that it might not benefit from the contribution. And the unique facts of the BEAT program with the payment mechanism that's designed to eliminate that risk sets this case apart from other location-induced cases where, if you use the language of the Supreme Court, any benefit was just going to be speculative. As the Sixth Circuit and federated department source emphasized there, the tax bill that listed it may not benefit at all from the contribution. Here, New Jersey knows that it's going to get a benefit. I mean, Broker Tech itself viewed it as a self-funded program, a performance-based program, where New Jersey gets the money first and then just returns a portion of the money to the recipients. Judge Bevis, my concern is, you tell me if you disagree, but Broker Tech submits that the second factor is really codifying or restating Detroit Edison. And, you know, in John D. White, we required a reasonable nexus with the services provided. You know, those are cases in which Ford is going to get more Ford sales out of, you know, locating Ford dealerships. Here, it's a lot less direct. These are payments for jobs in the public, and it's not the same services, the way that Ford has a relationship with Ford dealers selling. So how does this case satisfy the nexus requirement? Because, you know, there is still a nexus between the grants and the services that the recipients provide. They've had to employ certain employees, as opposed to independent contractors, to get the grants, and they had to pay them wages. And the direct benefit does not have to be providing the same useful business offering to the transferor. For example, in GM Trading, the transferor was provided debt forgiveness. That was the direct benefit that was disqualifying, whereas the transferee within the business there, I think, had to do with some sort of sheepskin manufacturing business. In Decent, another case where the contribution failed to qualify as a non-taxable contribution under the tax, the compensation was from the federal government for hiring and training of the employees. And these are employees hired by the taxpayer, not federal government employees. So as long as there is some nexus, the key is, again, is there a risk to the transferor that it's not going to get a benefit from the contribution? What about the language about it being a direct benefit? Well, this is a direct benefit. In fact, the New Jersey representative testified that New Jersey received a direct benefit. I mean, it cannot be any more direct. They actually get the tax revenue, the additional taxes from wages paid to the recipient's employees and withheld and remitted to the state before they release a dime. So this is not just the indirect benefit of a hope for economic development. They know they are receiving the direct benefit of additional taxes. I mean, this is why the New Jersey representative said this program pays for itself. Broker tax consultant said New Jersey wants to make sure that they are making money, and they are. They are making money off this program. That is the direct benefit. This is not a case of where a transferor is at risk that it's not going to get some sort of benefit from its contribution. You've been talking a lot about intent and the benefit, and you've been leaning on, understandably, on the trial record. Would you then say that we're in clear error review land where we can both examine the facts but also correct legal errors as we did in Bedrosian? I argue that it actually is legal, that the court's ruling conflicts with binding precedent and that it relied on the relevant facts, facts that are legally relevant, like the unilateral decision to invest the proceeds in stocks. So our argument is not contrary to the court's findings but are actually based on the specific findings that the court has made here. And so we suggest that the review here would be de novo as it was in cases like CB&Q where it was reversed without referring to any sort of deference to a fact finding. I think Claiborne analysis for Circuit Case was in the same sort of posture, GM trading, I think, as well. And now let me get back to our first alternative reason for reversing the tax court, which is that the grant cannot qualify as contributions to capital because New Jersey did not intend the grant to become a permanent part of the recipient's working capital structure. And again, we are relying on the tax court's findings, two main findings. One, the cash was completely unrestricted. It could have been used to pay operating expenses. It could have been used to pay dividends. And the cash was calculated on the basis of an operating expense, not on the basis of any sort of capital investment. And on such facts, other courts have all held that the contributions did not qualify as non-taxable contributions to capital. Now, the tax court relied on the affiliate's unilateral decision to purchase the stock and saying, well, that's how they made this a permanent part of the working capital structure. But that's legal error because under the case law, you look to the transfer's motive, not to the transferee's use. And here it's undisputed that New Jersey didn't care what the money was used for. In fact, the party stipulated that New Jersey didn't intend that the proceeds be used to purchase the stock. How do you deal with the interplay between intent of the transferor and use by the transferee? When you look at the Chicago, Burlington, and Quincy case, they go back and forth. And ultimately, I think it's on page 411 of the Supreme Court decision, that the factors are indicia, the use of that is, is an indicia of the transferor's intent or motive. But you would think that something would be CapEx, if you will, if it's used for a capital expenditure. But that's not the way the cases read, and that's not the way the regulation reads. What's the background to why the focus is on, I mean, dumb question time, but why is the focus on intent of the transferor as opposed to use by the transferee? Well, I think the focus is, and this, again, comes up in the context of non-shareholder contributions to capital. The question is, should someone who's not a shareholder essentially be treated as a shareholder when they make a contribution to capital? You know, were they just making a gift? Were they intending to subsidize income? And it is looking at it from the contributor's point of view. That's just how it's been developed in the case law, and it makes sense in the situation here where you have a government-wide program. So there's a number of recipients. They should all be treated the same tax-wise as opposed to living through a unilateral decision. So if you have one company that decides to use the funds to issue dividends and another company that decides to invest it in capital expenditures, you know, if you were looking at the use as opposed to intent, that would create disparate tax results. And so the focus is on what the contributor intended as opposed to the unilateral decision to, I've got these funds, maybe I'll use some for operating expenses, maybe I'll use some to invest into capital, into, you know, buildings or equipment. All right. That's interesting. I think, I'm sorry, Judge Schwartzfield, you go first. Thank you. Focusing still on Chicago, when you look at the factors it sets forth, there are a total of five. One, the last one being categorized as would ordinarily, if not always, be considered. Do you think that this is, they set forth a five-factor conjunctive test? Yes. I think either, in the way that the appellate courts have applied this test, at least with regard to the first two factors, if the taxpayer is unable to demonstrate that it satisfies one of those, then it doesn't qualify. Most of the cases actually turn on just the first two factors. I think there was only one other case, maybe AT&T, that discussed the third factor. I haven't located any cases other than CD&Q that actually discussed the fourth and the fifth factor. I'll take that back. I'm sorry. Southern, the 11th Circuit decision did. But most of the time they're just addressing one or two of the factors, and if you can't satisfy the first factor, it is not going to qualify as a contribution to capital. It happened in John B. White where the contribution there would have satisfied the first factor. It was a contribution made pursuant to a contract saying these funds need to be invested in leasehold interest. It nevertheless did not qualify as a contribution to capital because the transferor received a direct benefit there, and that violates or doesn't satisfy, rather, the second CD&Q factor. So when I look at page 413 of the Chicago Burlington case, you're saying you think that's conjunctive? It looks like it's five factors. But it's the way that each one is phrased that, you know, in terms of must or may not, at least the first two, which is what we've been focusing on. And I realize you're on. I'm sorry. Go ahead. You finish. Well, I was just going to say we haven't made an argument on the basis of the other factors, and they may not be present in each case, as some courts have said. But the first two, which is what the courts have been focusing on, the taxpayer does need to demonstrate that they satisfy both. And, in fact, in this case, growth protect is not denied. The first two factors must be met to qualify as a contribution to capital. And in this case, they can't satisfy either of those two factors based on the tax court's findings, and that's why we believe the tax court should be reversed. Now, I do want to make sure that I address the question. But before you get there, because it looks to me, it says on page 413 of Chicago Burlington, we can distill from these cases some of the characteristics of a non-shareholder contribution. It certainly must be a permanent part of the transferee's working capital structure. That seems like okay. It may not be compensation. You're right on the second one. Then it must be bargained for. The asset transferred must result in benefit, and the asset ordinarily, if not always, will be employed or contribute to the production of additional income. I'm not sure what the court meant there, because, as you say, I haven't seen much that's ever dealt with the 3, 4, and 5. I'm sorry. I don't think I can answer all of your questions regarding the factors that we haven't addressed in this case, because they really haven't been fleshed out in any other rulings other than the CB&Q case, at least not as it came up in our briefing. We're not relying on those other factors. Right. And CB&Q doesn't seem to – it really doesn't tell us directly conjunctive, disjunctive. I just don't know. One question. I know Judge Bevis had a question about the duty of consistency. Yeah. Yeah, I was kind of curious what role that plays here, and then who ultimately bears the burden of establishing this, to what degree of certainty the transfer is intent. Let me address the role. So the court asked in its letter whether the issue was copied before this court, and we believe that it is because it responds to an argument raised by Broker Tech in its answering brief. But I do want to emphasize that it's not an issue that the court has to address, because our primary response to Broker Tech's argument with regard to leasehold interest is that – investments, rather – is that it conflicts with the facts. And the facts in this case are uniformed, that the cash grants were not consideration for any promise to construct in New Jersey. We've summarized the testimony on pages 19 through 20, providing the sites of our reply brief, but the New Jersey representative emphasized in this case, in trial, that there are other New Jersey programs that are dependent on capital investments, but this is not one of them. This program is about job creation, and if they could create a job with no capital investments, that would be fine. That would have no impact on the grant. They didn't need to spend a penny on leasehold improvements, and that capital investment from this program, like other programs, was ultimately immaterial. And Broker Tech's own consultant, Mr. Lacey, testified that this program is performance-based, and the performance at issue is the payment of wages, budgets, withholding in New Jersey. That's on page 265 of the joint appendix. So if they invested $100 million in New Jersey City, but didn't pay any employees, any hired independent contractors, like some companies do, they would receive zero grants. But on the flip side, if they paid wages to employees subject to withholding, but invested zero in capital investments, they would get the grant. The dubious consistency, so we take the court to reject that argument on a factual basis for the fact that we've set out. But the dubious consistency is an additional reason why the argument fails, because as a matter of law, Broker Tech's argument is contrary to its own prior tax reporting. If New Jersey, as Broker Tech now claims, was actually motivated to make the grant because of capital investments in New Jersey, then Broker Tech should have reduced its basis in those depreciable investments in prior tax years, which would have reduced its available deductions claims in prior tax years. But it's undisputed, and we have the sites on page 24 of our required brief, that the basis was not reduced in those depreciable assets, that they reduced the basis of their stock instead. And so what the dubious consistency holds is that they can't now change their position after the statute of limitations is run on prior years, and it's too late for the commissioner to disallow depreciation deductions that were improperly claimed in prior tax years. So the short answer is probably before this court. We think it supports our position, but it's not our primary argument, and the court does not need to breach it. All right, thank you. Any further questions? I did have just two quick ones. Thank you. It had to do with what I guess we can call statutory history. In 2017, Section 118 was amended to say these sort of state grants could not be deemed contributions to capital. Should we take anything from that fact that the language of the statute has changed afterwards? We have not made an argument on the basis of that, other than to say that the ruling in this case would not have an impact on state grants. The things that are going on today with the current situation, it wouldn't apply to subsidies from the government post-2017 or from civic groups. But you don't even have to take some sort of negative inference or anything like that. Okay. The last question I had, and I thank the judge for letting me jump in on this. You used the language capital investment. Is that something different than working capital? The language from the case law is a permanent part of working capital structure. And what that means is it's the money that's actually invested in the business that's not free to be used for operating expenses or dividends. And in the case law, it really falls into two categories. It's capital investments, like buildings and equipment, or funds that are restricted to a capital reserve account, which was the example in the Southern Family case at the 11th Circuit decision that we discussed. And then I think there's a textbook case in our reply brief, Concord Village, that had to do with funds restricted to a capital account. But those are the two ways that working capital becomes a permanent part of the business. And that's what we need. Thank you. All right. Thank you. And I'm out of time. Can I just ask one last question? I'm sorry. Absolutely. Just kind of curious whether you think there is a distinction between the investing of money in stock or other intangibles versus investing in more tangible forms of capital. Is the Commissioner taking a position that those two are different? No. I mean, our position with regard to investing in stock is that was not New Jersey's intent, so it's legally irrelevant. But if that had been New Jersey's intent, there might be an argument that that qualifies. It would be nonsensical, so that's why it's hard to say, oh, would that have been enough if New Jersey had actually intended it, because that wasn't how the grant was calculated and, you know, it has nothing to do with New Jersey. But we have not taken the position it has to be tangible versus intangible capital investment. All right. Thank you very much, and we'll get you back on rebuttal. Oh, thank you very much. Mr. Blair. Yes. May it please the Court, my name is David Blair, and I'm counsel for the taxpayer in this case, Broker Tech Holdings, Incorporated. Our position is the tax court was correct in finding that the facts in this case fall squarely within the four quarters of its own regulation and are strikingly similar to those in Brown, Schuh, and McKay products. The taxpayer lost its headquarters on 9-11 and, as a result, had to move. It looked to New Jersey. New Jersey offered a grant in order to have the taxpayer move to New Jersey and bring its 700 jobs with it. This was a program to promote economic development. Yeah, we've got the facts here. So the total amount of New Jersey payments that Broker Tech received was, I guess, about $170 million. Is that correct, right around there? That's correct, Your Honor. Go ahead. Now that far exceeded the amount that Broker Tech expended on office space improvements and advanced furniture technology in the Jersey City location. I think that was about almost $100 million less. Is that correct? That's correct, Your Honor. So what happened is that the formula was agreed at the time of the grant, and as it turned out, as the company became more successful, added more people and increased the salaries, the amount turned out to be a lot more. So what then do you make of the statements in the Edwards and Brown-Schuh cases noting that the non-shareholder payments there were, in all instances, less than the amount expended on the capital asset that the government was trying to create in those cases? Edwards, it was a railroad. Brown-Schuh was a factory. Right, and I think it's important to note that in Brown-Schuh, the stipulations below, if you go back to the tax court opinion, show clearly that the parties stipulated in that case that the amounts were not restricted. And so the court made a point of that because it said, ultimately, that the taxpayer was allowed to claim basis in the assets because it expended its own unrestricted funds on those assets. And, of course, the underlying issue in the Brown-Schuh case was depreciation. So basis was important. So it is not the case that the amount either implicitly in that case, because of the stipulation, or explicitly had to be limited to the amount that was expended on hard assets. And as this court has said in the McKay Products case, the issue is whether the amount is intended to become part of the working capital. And working capital is not restricted to buildings or machineries. As the tax court here observed, it can be other things that are important to the operation of the business. And the McKay Products definition of working capital says it's the amounts that are used for the business to carry on its activities. And that's obviously going to depend on the type of business you have. Counsel, what's the difference between a permanent part of working capital structure and working capital? I don't see a significant difference between those two, Your Honor. I don't think a permanent part of working capital structure means this company can never pay another dividend. What it means is the company is going to be like Brown Shoe, where the conclusion is that based on all the facts, and the fact that the intent here was to benefit the community at large, that you can infer from the facts, as the tax court did below, from a review of all the facts, that there was an intent to benefit the community at large. And if you see the Wyoming, the Teleservice of Wyoming Valley case, you'll see that they actually went through this analysis and they said that for that reason, that there was intended to be a community benefit, that it was for that reason that it was held to be a contribution to capital. How do you square that with what your adversary just described as the benefit that New Jersey needed to receive before it was going to release $1, namely the payroll taxes? Your adversary said that's a direct benefit, it's not a community at large benefit, it's not speculative benefit, it's a concrete benefit. Doesn't that distinguish this case from the one you just cited? No, Your Honor, because the increase in tax revenue is an indirect benefit. It is not, has no nexus to a commercial relationship between the transferor and the transferee. So, for instance, in the White dealership case, there was clearly a commercial relationship and the payment was related to, it had a nexus to that commercial relationship. Ford wanted to sell more cars, so it helped them to move their location. But in this case, there's no commercial relationship at all between the taxpayer and the State of New Jersey. We're not offering any services to the State of New Jersey. The State of New Jersey is not asking us to provide any services. And these payments, the benefit that the State of New Jersey gets in terms of increased tax revenue, which, by the way, would have been the case in Brown Shoe and also in McKay Products, that as the community becomes wealthier and there's more wages paid, there's more of a tax base. Those are indirect benefits. So, from your point of view, then, any donation or transfer by the government, because there's no commercial relationship to a private entity, would always be a contribution capital? There are situations where a government can guarantee the income of a taxpayer from conducting certain commercial activities. So, for instance, in the Texas Pacific Railway case, that's a clear income subsidy case. And, in fact, in that case, there was a commercial relationship. But what happened there was the government had a commercial relationship with the railroad. It saw the railroad wasn't going to make enough money from its operations. And it says, we will guarantee you that you will make money from your operations. And here's a subsidy to guarantee that income. If the income falls below a certain level, we'll increase the income up to the level where you're making a sufficient profit from operations. Similarly, the telephone cases like AT&T. We see that we want you to provide telephone services in rural and high-cost areas. We see that you won't make money on that. So, we will guarantee that you will receive an adequate return on operations and guarantee your income in that way. But this is not a case where there was a commercial relationship. And it is not a case, certainly, where there was any finding by the government making the payment that they needed to support the income of BrokerTech. In fact, it's quite the opposite. The BEEP program was designed to bring into New Jersey very financially successful companies that paid high wages to employees that would be in the state of New Jersey and generally benefit the local economy. So, this was not a situation where they were trying to guarantee the income of this taxpayer or other BEEP recipients like Goldman Sachs. There's no indication of that. So, this is a different situation. Mr. Blair, you don't contest that you have the burden to prove unambiguously that this accession to wealth gets excluded from gross income, do you? No, Your Honor. The way that a corporation can receive funds is in three ways. They can receive it through debt, which is obviously not taxable. They can receive it through contributions to capital, which happen every day and obviously are not taxable to the corporation upon receipt. And then they can receive income from operations. All right. I don't see how you've satisfied that burden of proof then. I mean, let's set aside the second factor. You've got some good arguments on the second factor. But let's talk about the first CB&Q issue, which CB&Q seems to say at least that one is required. Don't keep a railroad, a Texas-specific railway, beside the issue. So, when I look through this, there are no restrictions on the use of cash payments. Everyone agrees. The payments were not calculated based on capital investment costs. New Jersey did not transfer any land or buildings with the cash payments. And the payments are substantially larger than the amounts of leasehold improvements or anything that's obviously capital. So, how can you succeed on the first factor then under CB&Q and Cuba Railroad and Texas-specific railway? If you look at the CB&Q factors in the context in which the court explained them, they explained that they were distilling certain factors from the two cases that they found that they were trying to explain at that point. On the one hand, Detroit-Edison, which held that payments for services was obviously not a contribution to capital. And on the other hand, Brown-Chu, where they found that a payment to induce you to move to a location, as I pointed out, unrestricted funds, stipulated to be unrestricted funds, that that was a contribution to capital. The court inferred a definite intent to make a contribution to capital from the overall set of facts. Now, CB&Q was not saying we're reversing Brown-Chu when they laid out those factors. They said we are distilling from Brown-Chu and from Detroit-Edison certain characteristics. And that first characteristic we would say is satisfied because we are like Brown-Chu. And like Brown-Chu, we're paying the location inducement of unrestricted funds in order to move to this location. And as Brown-Chu indicates, that is a contribution to capital. That first factor is stating that. Right. Just read this again. But in Brown-Chu and in McKay, they're transferring land or buildings or hard assets with the cash. So there's a portion of it that's just rooted there. And here it's entirely unrestricted cash. So one of the things that the tax court observed that I think is important here is that the IRS has conflated, in the court's view, capital assets with the capital of a corporation. So the working capital of the corporation, as this court said in McKay products, is that with which the corporation carries on its activities. Now, as the tax court observed below, for a manufacturing company like Brown-Chu, working capital is very much tied up in factories, machinery, et cetera. But in our modern economy, many businesses have working capital that is not tied up in hard assets. But the money that's deployed in the business, in order to generate income, still is working capital that falls within the definition here that's used in McKay products. I do want to quickly address the 362C issue that was raised by the court in the letter, if I may. In that, of course, it's not the taxpayer's position that these grants were restricted to the build-out of the Harborside facility. We stipulated that they were not restricted, so there's been no change in position. Moreover, those stipulations included a stipulation that any adjustment under 362C would be to the basis in the stock, not in the basis to any other asset. That position hasn't changed. The tax court followed the stipulations. It found that the funds were unrestricted, that the amounts were invested in stock, that any 362C adjustment would be to the basis in that stock. And they also found that the grants helped to stabilize this company's financial position after 9-11. The government's position on 362C, which, by the way, is waived because they did not raise it until their reply brief, and I can't argue that they were surprised about the issue because they raised it below before the tax court, as they indicated in their brief. But they're ignoring the plain language of 362C, which states that unrestricted cash received by a non-shareholder contribution to capital shall reduce the basis of any property acquired with such money during the 12-month period, beginning on the date the contribution is received. That's what the statute says. Of course, here, the build-out and all those hard asset investments happened well before the receipt of the money, so they didn't fall within that 12-month period. The REG doesn't purport to overturn that 12-month period. And, of course, the parties say that the amounts were unrestricted. Moreover, I want to point out that 362C, the language of it, completely inconsistent with the IRS's main point here. The government's main argument is that unrestricted cash cannot be a contribution to capital, and that violates the very premise of 362C. 362C expressly contemplates non-shareholder contributions to capital that are paid in unrestricted cash, and that is why Section 362C has a waterfall for how to allocate basis reductions when you have contributions to capital by a non-shareholder that are paid in unrestricted cash. Even if it's unrestricted, even if there is not a bar automatically, if it's unrestricted, it can't be a contribution to capital. We have to look at the context in which this event happened and the state's goal. Yes, you're correct. The state wanted to invigorate the economy, and it did so by this mechanism of encouraging businesses to come here. But the way that it calculated its award was based on payroll taxes, and it appears that even if you could use the money for whatever purpose you wanted, doesn't that also convey it's not going to be part of the permanent capital structure? It can be used however you choose, and therefore it's not consistent with the first factor of Chicago. And in addition, it was measured by payroll taxes, which is an operating expense. So doesn't this make this scenario different than Brown-Schuh? No, Your Honor. The cases which they're referring to here are income subsidy cases. So the Texas and Pacific Railway case and the AT&T cases and related cases. And all of those cases involve a situation where the government was saying, we recognize that we need to subsidize your income, and therefore we're going to give you a subsidy. I know. You said that before. I know, and I understood your point on that. But what I'm saying here is I'm not talking about income subsidy. I'm talking about the fact that the award here was calculated based on payroll taxes, which is an operating expense. So doesn't that shed light on the intent of the transfer? Or, which is what Chicago said, look out, we've got to glean the intent. And we have testimony that demonstrates it. We have the mechanism, the mechanics of this program. And how could we ignore that the grant was measured by payroll taxes, which is an operating expense, and that the money, taken together with the fact that the funds that were received could be used for any purpose and hence not part of the permanent capital structure. Don't those two matters together make this different, and therefore not a contribution to capital? So the court below, in looking at all of the factors, including this factor, came to the conclusion that this was an inducement to move to the state of New Jersey. Now, the measurement of the amount was, under the program, based on the income tax withholdings, and these are not our taxes, but the taxes of our employees, that would be submitted to the state of New Jersey. It was not a quid pro quo because the amounts had to be appropriated by the legislature. And as we know from the facts, often were not appropriated by the legislature, and yet we still had to pay over the withholdings. So there was no quid pro quo, as the government asserts. Also, the measurement of the amount of the grant included Pennsylvania residents who didn't pay any New Jersey taxes, but they still were included in the computation of the amount. Why did New Jersey compute the amount in this way? The reason they did that is because they wanted to make sure that this program was cash flow positive. Just like in McKay Products, the conditions of getting the grant had to be satisfied before the contribution there was transferred. So in McKay Products, there was a building that was transferred, but the transfer of the building would not occur until the community had gotten the benefit that they wanted, which was the payment of $5 million of wages. Only after the payment of $5 million of wages under the original contract, it was later waived, but under the original contract, only after the payment of $5 million of wages would the community transfer the building to the taxpayer. I see your point. But it does seem significant in the McKay Products, it's a factory. No one can deceive that a factory is a capital asset that's being transferred. And New Jersey could have set up this program the same way here. It didn't. It set it up as unrestricted cash that's being transferred, and it's back to Judge Schwartz's point. The fact that it can be used for anything, especially coupled with the way it's computed, seems to make this quite different from McKay. Well, there were conditions here, Your Honor. In order for the taxpayer to get the grant, they had to first move to Jersey City. They had to bring their 700 employees with them. It was understood that in the wake of 9-11, having lost their offices, that there was going to have to be capital investment. But wasn't New Jersey saying, here's $50 million in order to build a building? That's not what happened. Did New Jersey consider that they would benefit from having a new headquarters there? Did they consider that there would be construction? Clearly they did. That was part of the application. If you look at also the New Jersey DEP press releases that were given over the years, they continuously emphasized the benefit of building that occurred as a result of BEEF grants because that also generated jobs. But Brown-Chu, as I said earlier, did not involve restricted cash. It was stipulated in that case that the cash was unrestricted, not just the $10,000, but the entire $800,000. It was unrestricted. So CD&Q is not in the first factor saying we're overturning Brown-Chu, and it has to be restricted. But when you look at the facts in this case, the grant itself didn't provide as a condition that the monies be used to acquire a capital asset. And it doesn't look as if the grant required the monies to be placed into a capital account. And so that would seem to suggest an intent to provide additional income to Brokertect rather than to contribute to its permanent working capital structure. That's the concern that you're hearing from us. Right. And the cases that involve income being paid to, these cases are basically asking, if you look at Detroit Edison on the one hand and Brown-Chu on the other hand, Detroit Edison, it's a payment for services, that's from operations, that's income. As I said earlier, that is the category of income that a corporation receives that we all know is taxable, income from operations. What the Brown-Chu case says is when we don't have that kind of commercial relationship, but rather we have this payment that's being made to a corporation in order to induce it to do something that doesn't have a direct nexus to a commercial relationship, that then we infer another purpose. We look at all the facts and we infer another purpose. And that's what the tax court did here. It looked at all the facts and it inferred a purpose that was not to make a payment in the context of a commercial relationship, but rather to add to the working capital of the company. And as the court observed below and as this court observed in McKay products, working capital is not the same as hard assets. This also doesn't mean that – I don't really understand what the IRS is saying in terms of restricting to a capital account. It doesn't mean that the funds have to be marked with a beep and put in a suitcase and locked away forever and never used on anything. Working capital, as this court observed, is the amounts that are used by the company, deployed in the business in order to generate more income. CB&Q, actually those factors in CB&Q and the reason that case was different from Detroit Edison and from Brown Shoe is because there there was no effort at all to benefit the company. What CB&Q involved was states coming to a railroad saying, you must, you have no choice, you must improve the traffic flow, you must improve the safety associated with your railroad, and we're going to pay you the cost of doing that. But there was no benefit to the railroad. They said the benefit to the railroad was marginal. So there was no effort to give anything to the railroad of any value. There was no effort to add to its ability to generate income. But here there is an amount that's made available to the company. It's not in the context of a commercial relationship. It's in the context of saying you move to our jurisdiction, you benefit our community, and we'll make these funds available to you so that you can generate further income in your business. And that's the way we deployed it. And that's the court observed that there were a series of transactions in which, through the investment in the stock and then on investments that set out in the stipulations, we went and acquired a number of other companies in different trading areas so that we could expand our business. That's exactly what happened here. All right. Thank you very much. Any further questions from my colleagues? No. No, thank you. Okay. Thank you. We'll hear from Ms. Hagley. Thank you. I just actually had a few quick points. Number one, that Broker Tech didn't need the subsidy doesn't mean that it's not income. Wealthy companies can receive income. And, in fact, they treated it as income on their books. Number two, they failed to show that New Jersey faced any risk. They question our use of the phrase quid pro quo. We use quid pro quo in the sense that New Jersey guaranteed that it at least would receive its end of the bargain, its direct benefit, before it gives out any grant, and that the grants were subject to appropriation. And that just meant that Broker Tech's affiliates may not receive their part of the bargain. But New Jersey definitely was going to have a positive cash flow. This was a self-funded program. This is what set this location adjustment program apart from others. And, finally, I just want to conclude with that Broker Tech has not cited a single case that treated cash payments as non-taxable contributions to capital, that there was no restrictions, implicit or explicit, and that the funds could be used for dividends or for operating expenses. They've cited no case where the cash grant is calculated on the basis of an operating expense that qualifies. And, finally, they've cited no case where the cash grants were effectively funded, self-funded, to use Broker Tech's word, by the transferring. Unless your court has any further questions. Very well presented arguments. And I would ask counsel if you would get together with, I guess, Mr. Cain. Is that right, Greg? Yes, I can assist counsel. Is it a transcript? Yeah, I can assist counsel. So if you would have a transcript prepared of this oral argument and then just split the cost evenly. But, again, thank you very much. Very interesting case. And we'll take the matter under advisement.